## IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ALABAMA
## NORTHWESTERN DIVISION

| | | |
|---|---|---|
| **REBECCA S. TOWNSEL,** | ) | |
| | ) | |
| **Plaintiff** | ) | |
| | ) | |
| **v.** | ) | **Civil Action No. 3:08-CV-02152-RDP** |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION

Rebecca S. Townsel ("Plaintiff") brings this action pursuant to Section 205(g) of the Social Security Act ("the Act") seeking review of the decision of the Commissioner of Social Security ("Commissioner") denying her claim for Social Security Disability Insurance ("SSDI") benefits. *See* 42 U.S.C. §§ 405(g). For the reasons outlined below, the Commissioner's decision is due to be reversed and this case remanded back to the Commissioner for a rehearing in accordance with this opinion.

**I.       Proceedings Below**

Plaintiff applied for a period of SSDI benefits on July 22, 2006, alleging an onset date of disability of January 9, 2006. (Tr. 88-102). Plaintiff's application was denied and she requested a hearing before an Administrative Law Judge ("ALJ"). (Tr. 77-82). Plaintiff's case was heard by ALJ Randall C. Stout on February 7, 2008. (Tr. 26-59). In his March 19, 2008 decision, the ALJ determined that Plaintiff was not eligible for a period of SSDI benefits because she did not meet the disability requirements of the Act and retained the residual functional capacity ("RFC") to perform some medium work. (Tr. 12-22). Less than two weeks after the ALJ's decision, Plaintiff tried,

unsuccessfully, to commit suicide by taking an unknown quantity of Vasotec and Toprol. (Tr. 447-48). On May 14, 2008, Plaintiff requested that the Appeals Council review the ALJ's decision. (Tr. 5-8). Despite this additional evidence of depression, the Appeals Council denied Plaintiff's request for review of the ALJ's decision on September 19, 2008, thereby making the ALJ's decision the final decision of the Commissioner, and subject to review by this court. (Tr. 1-4).

Plaintiff was born on February 1, 1950. (Tr. 125). She successfully acquired a GED in 1995. (Tr. 122). Prior to 1999, Plaintiff worked first as a sewing specialist, then as a sander, and finally as a certified nurses' aid in a nursing home. (Tr. 103, 105-108). From 1999 until January 9, 2006, her alleged onset date of disability, Plaintiff worked as a brazer. (Tr. 103-104). Plaintiff has not been employed since January 9, 2006. (Tr. 14, 115). Plaintiff alleges she suffers from several conditions that prevent her from working, including syncope, diverticulitis, and Meniere's disease, as well as depression and anxiety. (Tr. 115).

On November 21, 2001, Plaintiff appeared at the Heart Center in Scottsboro, Alabama, complaining of frequent short-lasting chest pains and unpredictable swelling of the face and hands. (Tr. 169). She reported a past surgical history of hysterectomy with oophorectomy. (*Id.*). Dr. Khan, the treating M.D., noted a family history of Alzheimer's and coronary artery disease. (*Id.*). Dr. Khan also noted that Plaintiff apparently did not smoke or drink alcohol. (*Id.*). Plaintiff was given a stress test which came back clinically and electrically negative. (Tr. 170). Dr. Khan instructed Plaintiff not to worry about the chest pains and prescribed hydrochlorothiazide for her swelling. (Tr. 170-71).

On September 15, 2004, Plaintiff met for the first time with Dr. Daniel Ortiz. (Tr. 234-35). At that time, Plaintiff complained of an ongoing infection of her left ear she felt was a result of her constant exposure to welding, smoke, and plume at her job. (*Id.*). Dr. Ortiz's examination revealed

2

a perforation of the left tympanic membrane with erythema and edema of the eardrum, as well as severe nasal septal deformity. (*Id.*). Dr. Ortiz prescribed antibiotics, Floxin drops, and Nasonex spray to deal with these medical issues on a trial basis. (*Id.*).

On April 1, 2005, Dr. Ortiz examined Plaintiff once again. (Tr. 233). Plaintiff was still experiencing left ear and nasal issues. (*Id.*). Dr. Ortiz scheduled a CAT scan for Plaintiff and continued the prescribed antibiotics, Floxin drops, and Nasonex spray until he could consider the results of the CAT scan. (*Id.*).

On April 26, 2005, Dr. Ortiz met with Plaintiff once again and diagnosed her with Meniere's disease. (Tr. 230-32). A few days earlier, Dr. Ortiz performed audiometric and vestibular testing on Plaintiff. (Tr. 230). Plaintiff's test results were consistent with Meniere's disease. (*Id.*). Additionally, Dr. Ortiz felt that Plaintiff's disease was bilateral, as pressure on Plaintiff's right side was elevated on the day of the testing. (*Id.*). Dr. Ortiz felt that Plaintiff's disease was fluctuating from side to side and appeared to be intermittent. (*Id.*). The results of the CAT scan were consistent with the physical findings of nasal septal deformity. In order to move forward quickly with perfusion treatment of the ears, Dr. Ortiz gave Plaintiff material for a low salt and low stimulant diet designed to help lessen the effects of Meniere's disease. (Tr. 230-31).

On June 6, 2005, Dr. Ortiz performed a perfusion of Plaintiff's left middle ear to help with what he felt was chronic left vestibular Meniere's disease. (Tr. 228-29). On June 21, 2005, Plaintiff underwent a follow-up perfusion treatment. (Tr. 227). Both perfusion treatments apparently went well and Plaintiff left after the second treatment "feeling better." (Tr. 227-28). At that time, because he believed Plaintiff's problem were resolved, Dr. Ortiz recommended no further treatment. (Tr. 227).

3

However, Plaintiff returned to Dr. Ortiz less than one month later "feeling very strange." (Tr. 226). Her vertigo, which Dr. Ortiz hoped would be eliminated by the perforation treatments, had returned and she was experiencing pressure and problems now with her right ear. (*Id.*). Dr. Ortiz worried that Plaintiff's symptoms showed "an exacerbation and continuation of her Meniere's disease," but also referred her to another doctor to see if she was actually suffering from orthostatic hypotension. (*Id.*).

At this time, Plaintiff began a period of several months during which time she was not actively treated for her Meniere's disease. (Tr. 180-224). However, during this time, she attended the Scottsboro Quick Care Clinic where she was treated by Dr. Younus Ismail for some diarrhea, as well as a second degree burn to her abdomen which she received accidentally while holding a hot iron rod. (Tr. 191-94). Dr. Ismail prescribed doxycycline and Nexium which apparently cleared up Plaintiff's symptoms. (Tr. 191).

In April 2006, Plaintiff resumed her treatment for Meniere's disease, this time with Dr. George Morgan at the Clinic for Neurology in Huntsville, Alabama. (Tr. 180-87). It was Dr. Morgan's concern that Plaintiff's problem may be the result, in part, of her noncompliance with her blood pressure prescriptions. (*Id.*). Plaintiff was taking diuretics regularly as she apparently gained a considerable amount of weight when she did not. (Tr. 180). Plaintiff also took her antihypertensives only when her blood pressure became high, as opposed to taking them on a regular basis, in an attempt to avoid taking an antihypertensive when her blood pressure was low. (Tr. 185). After Dr. Morgan proffered this noncompliance theory, he concluded that he had "pretty well reached the end of [his] rope as to explain what [was] happening to [Plaintiff] beyond the fact that she appears to have recurrent hypotensive syncope of unknown etiology" and stated that he did not

4

have anything else to offer neurologically unless Plaintiff underwent a significant change. (Tr. 181).

Plaintiff returned to Dr. Ortiz's office on May 16, 2006. (Tr. 225). Dr. Ortiz recommended that Plaintiff not operate machinery and thus, should not continue to work. (Tr. 270). Dr. Ortiz also advised that Plaintiff should not drive a car. (*Id.*). The following day, Dr. Ortiz performed another perfusion treatment for Plaintiff's chronic vestibular Meniere's disease, this time on Plaintiff's right ear. (Tr. 224). As happened before, Plaintiff returned for a follow-up perfusion treatment one week later. (Tr. 223). On June 9, 2006, Plaintiff returned to Dr. Ortiz's office for a follow-up evaluation. (Tr. 221). At that time, Plaintiff was still experiencing "some sinus and allergy type symptoms." (*Id.*). Plaintiff stated that her vertigo would be better until these sinus and allergy symptoms returned. (*Id.*). Dr. Ortiz was still of the opinion that Plaintiff suffered from Meniere's disease and thought Plaintiff should undergo nasal septal reconstruction. (*Id.*). Dr. Ortiz also prescribed Dyazide to help with Plaintiff's Meniere's disease. (*Id.*).

After a nasal septal reconstruction in late June 2006, Plaintiff returned to Dr. Ortiz in late July of that year for a follow-up evaluation. (Tr. 217-19). At that time, Plaintiff was still having some left ear pain and intermittent vertigo, but Dr. Ortiz noted that the vertigo was "being well controlled." (Tr. 217). However, in August 2006, Dr. Ortiz noted that Plaintiff was still under active treatment for Meniere's disease and should not operate machinery or drive a car. (Tr. 270).

Following his examination on May 16, 2006, Dr. Ortiz referred Plaintiff to Dr. Stephen Green who examined Plaintiff two days later for her hypertension, chronic headaches, chronic hip pain, anxiety and depression. (Tr. 208-14). Dr. Green prescribed Tramadol, Flexeril, and Celebrex for Plaintiff's hip pain, Propanolol for her migraine headaches, Klonopin and Wellbutrin for her depression and anxiety, as well as continued antibiotics for her diverticulosis. (*Id.*). One month

later, Dr. Green continued each of these prescriptions and noted that Plaintiff had been experiencing extreme fatigue and was being examined by an endocrinologist to see if she suffered from Addison's disease. (Tr. 204-205).

On May 23, 2006, Plaintiff was evaluated by Dr. Steven Cowart. (Tr. 264-65). Dr. Cowart believed Plaintiff did not have an adrenal insufficiency, but did have syncope of an uncertain etiology with apparent orthostatic changes, irritable bowel syndrome, Meniere's disease, and a history of hypertension. (Tr. 265). Plaintiff returned to Dr. Cowart on August 2, 2006, for an MRI. (Tr. 254). The MRI revealed only a tiny increased signal in the right frontal lobe, but could not cause Dr. Cowart to exclude the possibility of a vascular malformation. (*Id.*).

On October 11, 2006 Plaintiff was examined by psychologist Dr. Bonnie Atkinson, at the request of the state disability agency. (Tr. 278-83). Dr. Atkinson diagnosed Plaintiff with: Axis IA - mood disorder NOS; Axis IB - history of panic attacks; Axis II - R/O personality disorder; Axis III - arthritis, acid reflux, dizzy spells, muscle spasms, diverticulities, blood pressure, irritable bowel syndrome, Meniere's Disease, migraines; Axis IV - no employment, no insurance; AXIS V - Global Assessment of Functioning ("GAF.") at 60-65. (*Id.*). Dr. Atkinson's conclusion was that Plaintiff "is mentally ill but not mentally retarded."

On October 24, 2006, a Psychiatric Review Technique and a Mental RFC Assessment was performed by the state agency nonexamining psychologist, Dr. Aileen McAllister. (Tr. 284-301). Dr. McAllister found that the evidence did not establish the presence of the required criteria for impairment listings 12.04 (affective disorder) or 12.06 (anxiety-related) of 20 C.F.R. Part 404 Subpart P Appendix 1. (Tr. 295). However, Dr. McAllister rated Plaintiff's limitations as to her

6

activities of daily living, social functioning, and concentration, persistence and pace as moderate. (Tr. 294).  20 C.F.R. § 404.1520a.

The next day, Dr. Leonard Bleidt completed a Physical RFC Assessment of Plaintiff.  (Tr. 302-309).  Dr. Bleidt recommended that Plaintiff avoid all exposure to hazards such as machinery and heights.  (Tr. 306).

On November 20, 2006, Plaintiff saw Dr. S.K. Sandella at the Helen Keller Hospital in Sheffield, Alabama.  (Tr. 325).  Dr. Sandella diagnosed mitral valve prolapse with no significant mitral regurgitation.  (*Id.*).  Plaintiff also saw Dr. Subir Paul around that same time.  (Tr. 318).  Dr. Paul was also of the opinion that Plaintiff had hypertension, mitral valve prolapse, Meniere's disease, diarrhea and vomiting, migraines, and arthritis.  (*Id.*).  Dr. Paul had seen Plaintiff less than a week earlier and given the same diagnosis.  (Tr. 327-28).  Dr. Paul prescribed Fioricet, Klonopin, half-strength Estratest, Zestoretic, Flagyl, Levaquin, and Reglan.  (Tr. 328).

On December 5, 2006, Plaintiff saw Dr. David Longmire, a neurologist.  (Tr. 364-69, 379). Plaintiff complained of fainting and losing her balance among other things. (Tr. 369).  Dr. Longmire believed Plaintiff had a peripheral vascular insufficiency, postural hypotension, metabolic encephalopathy, and vasovagal syncope.  (Tr. 364).  Dr. Longmire recommended that Plaintiff undergo an MRA.  (*Id.*).

On February 6, 2007, Plaintiff saw Dr. Jeffrey Goodman for pain in her right shoulder.  (Tr. 331-33).  Dr. Goodman believed Plaintiff had right rotator cuff tendinitis.  (Tr. 332).  He injected Plaintiff with Betadine and prescribed Naprosyn with precautions.  (*Id.*).

Plaintiff also continued to see Dr. Longmire in 2007.  (Tr. 394-99).  On April 12, 2007, Plaintiff saw Dr. Longmire, complaining of three fainting spells in the last month.  (Tr. 398).  On

7

April 17, 2007, Plaintiff saw Dr. Longmire again, complaining of a fainting spell that resulted in a couple hours of unconsciousness that day.  (Tr. 394).

On May 31, 2007, Plaintiff saw Dr. Keith Morrow.  (Tr. 408).  Dr. Morrow diagnosed Plaintiff with cholelithiasis.  (*Id.*).

## II.    ALJ Decision

Determination of disability proceeds under a five step analysis.  20 C.F.R. § 404.1520(a). First, the Commissioner determines if the claimant is engaged in substantial gainful activity.  20 C.F.R. § 1520(a)(4)(i).  If the claimant is engaged in substantial gainful activity, she is not deemed to be disabled under the Act.  Second, the Commissioner determines if the claimant has a severe, medically determinable impairment that meets the durational requirement.    20 C.F.R. § 404.1520(a)(4)(ii); 20 C.F.R. 1509.  If the claimant does not possess such an impairment, she is not disabled.  Third, the Commissioner decides if the impairment meets or medically equals the criteria for an impairment listed in 20 C.F.R. Part 404 Subpart P Appendix 1.    20 C.F.R. § 404.1520(a)(4)(iii).  If the impairment does not meet the listing, the claimant is not disabled.  Fourth, the Commissioner determines whether the claimant possesses the RFC to do past relevant work.  20 C.F.R. § 404.1520(a)(4)(iv).  If the claimant can perform past relevant work, she is not disabled. Fifth, the Commissioner determines whether the claimant can perform other work based on her RFC, age, education, and work experience.  20 C.F.R. § 404.1520(a)(4)(v).  If she can perform other work, the claimant is not disabled.  If the claimant is deemed not to be disabled at any point in the process, the analysis ends.  20 C.F.R. § 404.1520(a)(4).

The ALJ found that Plaintiff meets the insured status requirements of the Act through December 31, 2010, and that Plaintiff has not engaged in substantial gainful activity since January

9, 2006, the alleged onset date of disability.  (Tr. 14).  The ALJ also found that Plaintiff has the following severe impairments: mild hearing loss in the left ear, complaints of passing out and vertigo thought to be the result of use of diuretics, disc bulging in the cervical spine with no stenosis or herniations, non-insulin diabetes, hypertension, anxiety, depression and mood disorders.  (*Id.*).  While these impairments were found to be severe, the ALJ concluded that they did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404 Subpart P Appendix 1.  (Tr. 17).  The ALJ determined that Plaintiff possessed the RFC to perform medium work that does not require climbing ropes, ladders or scaffolding, and would allow Plaintiff to stay away from unprotected heights and dangerous, moving, unguarded machinery.  (Tr. 18).  The ALJ further determined that although Plaintiff could not perform any past relevant work, her age, education, work experience, and RFC would allow her to perform jobs that exist in significant numbers in the national economy.  (Tr. 20-21).  Thus, the ALJ determined that Plaintiff was not disabled under the Act.  (Tr. 22).

## III.    Plaintiff's Argument for Remand or Reversal

Plaintiff seeks to have the ALJ's decision remanded for further proceedings, including an additional hearing.  (Doc. #10, at 20).

## IV.    Standard of Review

The only issues before this court are whether the record reveals substantial evidence to sustain the ALJ's decision, *see* 42 U.S.C. § 405(g); *Walden v. Schweiker*, 672 F.2d 835, 838 (11th Cir. 1982), and whether the correct legal standards were applied.  *See Lamb v. Bowen*, 847 F.2d 698, 701 (11th Cir. 1988); *Chester v. Bowen*, 792 F.2d 129, 131 (11th Cir. 1986).  Title 42 U.S.C. §§ 405(g) and 1383(c) mandate that the Commissioner's findings are conclusive if supported by "substantial evidence."  *Martin v. Sullivan*, 894 F.2d 1520, 1529 (11th Cir. 1990).  The district court

may not reconsider the facts, reevaluate the evidence, or substitute its judgment for that of the Commissioner; instead, it must review the final decision as a whole and determine if the decision is reasonable and supported by substantial evidence. *See id* (citing *Bloodsworth v. Heckler*, 703 F.2d 1233, 1239 (11th Cir. 1983).

Substantial evidence falls somewhere between a scintilla and a preponderance of evidence; "[i]t is such relevant evidence as a reasonable person would accept as adequate to support a conclusion." *Martin*, 894 F.2d at 1529 (quoting *Bloodsworth*, 703 F.2d at 1239) (other citations omitted). If supported by substantial evidence, the Commissioner's factual findings must be affirmed even if the evidence preponderates against the Commissioner's findings. *See Martin*, 894 F.2d at 1529. While the court acknowledges that judicial review of the ALJ's findings is limited in scope, the court also notes that review "does not yield automatic affirmance." *Lamb*, 847 F.2d at 701.

## V.    Discussion

The ALJ found that Plaintiff's fainting was the result of noncompliance with medicinal prescriptions despite evidence from at least three doctors suggesting that her fainting was actually a symptom of Meniere's disease. (Tr. 15-18, 265, 270, 318). His determination was made in conjunction with a consideration of impairment listings 12.04, 12.06 and 11.01. (Tr. 17-18). However, in reaching his determination, the ALJ did not consider impairment listing 2.07, which specifically covers Meniere's disease.

It is well settled that the ALJ has a duty to fully and fairly develop the record. *See Ellison v. Barnhart*, 355 F.3d 1272, 1276 (11th Cir. 2003). Here, admittedly Plaintiff did not squarely raise the argument that listing 2.07 applies. However, as the District Court of Kansas has held:

> It is the Commissioner's responsibility to develop the record, consider whether plaintiff's condition meets or equals the listing, and explain the rationale for his decision thereon. This he did not do. The Commissioner's argument implies that plaintiff may not assert error with regard to Listing 12.05(C) either because plaintiff did not specifically make that argument to the ALJ or the Appeals Council, or because he did not present the additional evidence to the ALJ. Both arguments are foreclosed by precedent binding on this court.

*Soverns v. Astrue*, 501 F.Supp.2d 1311, 1321 (D.Kan. 2007). The fact that a claimant fails to argue that she met a specific listing should not prevent the ALJ from considering that listing when it appropriate to do so. *Id.* In this case, despite ample evidence of Plaintiff's Meniere's disease, the ALJ did not consider listing 2.07, the Meniere's disease listing. Certainly, the ALJ's failure to consider listing 2.07 could be understood to be the result of Plaintiff's failure to argue for this specific listing to the ALJ. But again, as indicated by the court in *Soverns*, an ALJ has the duty to consider the appropriate listing even if Plaintiff fails to specifically argue for it when (as is the case here) evidence of a disease relevant to the listing appears to dominate much of the record.

There is nothing in the record that contradicts the opinions of numerous doctors who diagnosed Plaintiff with Meniere's disease. While there is some evidence of Plaintiff's noncompliance with her blood pressure medications, that alone is insufficient to justify the failure to consider the application of listing 2.07 for Meniere's disease.

## VI.   Conclusion

The court concludes that the ALJ erred by not applying listing 2.07. Therefore, the Commissioner's final decision is due to be reversed and remanded in accordance with Sentence Four of § 405(g) of the Act, for examination of Plaintiff's status in conjunction with a consideration of listing 2.07.

**DONE** and **ORDERED** this _____7th_____ day of October, 2009.

**R. DAVID PROCTOR**
UNITED STATES DISTRICT JUDGE